# FRANCE *v.* UNITED STATES.

## ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 495.  Argued November 13, 1896. — Decided January 4, 1897.

The plaintiffs in error were engaged in the management and conduct of two lotteries at Covington, Kentucky, opposite Cincinnati, Ohio, where there were drawings twice a day. They had agents in Cincinnati, each of whom, before drawing, sent a messenger to Covington, with a paper showing the various numbers chosen and the amounts bet, and the money, less his commissions. After the drawing, what was termed "an official print" was made, which consisted of a printed sheet showing the numbers in their consecutive order as they came out of the wheel and on the line beneath the numbers were arranged in their natural order. In addition to the "official print" these messengers, after the drawing had been had, brought back to the agents at Cincinnati what was known as "hit-slips." These were slips of paper with nothing but the winning numbers on them, together with a statement of a sum in dollars. The money to the amount named on the paper was brought over by the messenger to the agent in Cincinnati. Some of these messengers were arrested as they were coming from Covington, walking across the bridge, and just as they came to the Cincinnati side. They had with them in their pockets the official sheet and the hit-slips, as above described, containing the result of the drawing, which had just been concluded at Covington. They had the money to pay the bets, and were on their way to the various agents in the city of Cincinnati. Procuring the carrying of these papers was the overt act towards the accomplishment of the conspiracy upon which the conviction of plaintiffs in error was based. There was nothing on any of the papers which showed that any particular person had any interest in or claim to any money which the messengers carried. The plaintiffs in error were indicted, under Rev. Stat. § 5440, for conspiring to violate the act of March 2, 1895, c. 191, "for the suppression of lottery traffic through national and interstate commerce."

Opinion of the Court.

*Held,* that the carrying of such books and papers from Kentucky to Ohio was not, within the meaning of the statute, a carrying of a paper, certificate or instrument purporting to be or represent a ticket, chance, share or interest in or dependent upon the event of a lottery, so called gift concert, or similar enterprise, offering prizes depending upon lot or chance, as provided for in such statute; as the lottery had already been drawn; as the papers carried by the messengers were not then dependent upon the event of any lottery and as the language as used in the statute looks to the future.

THE case is stated in the opinion.

*Mr. A. W. Goldsmith* and *Mr. James C. Carter* for plaintiffs in error. *Mr. Edward Colston* and *Mr. George Hoadly, Jr.,* were on Mr. Goldsmith's brief.

*Mr. Assistant Attorney General Whitney* for defendants in error.

Mr. JUSTICE PECKHAM delivered the opinion of the court.

The plaintiffs in error were indicted for and convicted of the offence of conspiracy, under section 5440 of the Revised Statutes. They were charged in the indictment with conspiring to violate the act of Congress, passed March 2, 1895, c. 191, for the suppression of lottery traffic through national and interstate commerce, etc. 28 Stat. 963.

The section of the Revised Statutes and the first section of the act, above referred to, are set forth in the margin.[1]

---

[1] SEC. 5440. If two or more persons conspire either to commit any offence against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than one thousand dollars and not more than ten thousand dollars, and to imprisonment not more than two years.

ACT OF 1895.

CHAP. 191. An act for the suppression of lottery traffic through national and interstate commerce and the postal service subject to the jurisdiction and laws of the United States.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any person who shall cause to be brought within the United States from abroad, for the purpose of disposing of the same, or deposited in or carried by the mails of the United

The indictment contains six counts, charging overt acts on the part of plaintiffs in error, to have been committed in Hamilton County, Ohio, in October, 1895.

The trial of the plaintiffs in error having been duly commenced in the District Court of the United States for the Southern District of Ohio, it appeared in the course of the evidence then taken that there were two lotteries, called respectively the "H" or "Henry Lottery," and the "K" or "Kentucky Lottery," both of which were carried on in Covington, Kentucky, under the management of one of the plaintiffs in error, the others being engaged in the business under his direction.

Witnesses for the government testified to the manner in which the lotteries in question were conducted. It was shown by their evidence that the main office where the drawing was done was situated on the Kentucky side of the river and in the city of Covington. There was a drawing twice in each day for each lottery. The drawing in each case was from a glass wheel in which the numbers, from 1 to 78, were placed, and one number was drawn out at a time until 12 had been drawn. The betting is in regard to the sequence in which the numbers will be drawn from the wheel, and three numbers are usually chosen, such for instance as 7, 28, 16. This is called a "gig." If the player bet on these numbers and they are drawn from the wheel in that order, he has won his bet. There are agents for these lotteries, as some of the witnesses said, "in every street in Cincinnati." An agent has an office consisting of a single room, where he receives persons who

States, or carried from one State to another in the United States, any paper, certificate or instrument purporting to be or represent a ticket, chance, share or interest in or dependent upon the event of a lottery, so-called gift concert, or similar enterprise, offering prizes dependent upon lot or chance, or shall cause any advertisement of such lottery, so-called gift concert or similar enterprise, offering prizes dependent upon lot or chance, to be brought into the United States, or deposited in or carried by the mails of the United States, or transferred from one State to another in the same, shall be punishable in the first offence by imprisonment for not more than two years or by a fine of not more than one thousand dollars, or both, and in the second and after offences by such imprisonment only.

propose to patronize the lottery. The person, coming to the office, chooses his numbers; the agent gives him a paper containing nothing but the numbers and in the sequence which he has chosen, two copies of which the agent keeps. At a certain hour before the drawing of the lottery in Covington, each agent in Cincinnati sends his messenger with a paper showing the various numbers chosen and the amounts bet, and he also sends the money, less his commissions, to the main office across the river. These messengers must arrive a certain time before the drawing or they will not be permitted to share in the drawing which is then about to take place. After the drawing, what is termed an " official print " is made, which consists of a printed sheet showing the numbers in their consecutive order as they came out of the wheel and on the line beneath, the numbers are arranged in their natural order. This " official print " is in the form of a book, and after the drawing it is returned to the agent in Cincinnati, who on his part sends it back again just prior to the next drawing. In addition to the " official print," these messengers, after the drawing has been had, bring back to the agents at Cincinnati what is known as " hit-slips." These are slips of paper with nothing but the winning numbers on them, together with a statement of a sum in dollars. The agent understands this named sum to be the amount payable to those who have won upon the last drawing. The identification of the drawing at which the winning numbers came out is made by numbering each drawing. The money to the amount named on the paper is brought over by the messenger to the agent in Cincinnati.

Some of these messengers were arrested as they were coming from Covington, walking across the bridge, and just as they came to the Cincinnati side. They had with them in their pockets the official sheet and the hit-slips, as above described, containing the result of the drawing, which had just been concluded at Covington. They had the money to pay the bets, and were on their way to the various agents in the city of Cincinnati. Procuring the carrying of these papers was the overt act towards the accomplishment of the

conspiracy upon which the conviction of plaintiffs in error was based.

There was nothing on any of the papers which showed that any particular person had any interest in or claim to any money which the messengers carried. The papers were simply the means used to impart information from the main office in Covington to the agent in Cincinnati as to the result of the drawing of the particular lottery. They in fact referred entirely to a past drawing, and even as to that they furnished no evidence that any particular person or that the bearer had any interest in the result of the lottery already drawn. They were addressed to no one, and were signed by no one. Nothing but figures were there. None but the agent had the necessary information as to the persons who were interested in, or who might be entitled to any money by reason of the result of, the drawing. The papers did not purport to be or to represent a ticket, chance, share or interest in or dependent upon the event of any lottery.

For the purpose of determining one of the questions raised by counsel for the plaintiffs in error, it may be assumed that the evidence was sufficient to justify the jury in finding plaintiffs in error guilty of the conspiracy to do the acts above mentioned, either as managers of a lottery in Covington, or as agents in transmitting papers and books containing the matter above stated. After the evidence was all in, each of the plaintiffs in error asked the court to charge the jury that in regard to his individual case the jury should be directed to find a verdict of not guilty, and that as to him the United States had failed to make out a case, and that the verdict of the jury should, therefore, be in his favor. The court refused to charge as requested, and each defendant duly excepted to such refusal. We think the request was proper and should have been granted by the court.

Some criticism is made by the learned counsel for the defendant in error, based upon the particular language of the request to charge. He says that the only request was made on the part of the defendant A. L. France, and that such request in regard to him was joined in by the other

defendants, so that their request was that he (France) should be acquitted by the direction of the court, and that no request was made in their own behalf.  Possibly the language appearing in the record, when read without the context, is capable of such a construction, but it is apparent from the questions in the case and the evidence which had been taken regarding all the defendants, that such was neither the intention of the counsel for the plaintiffs in error nor the understanding of the court.    The plain intention was that the same directions which were asked for in regard to the defendant A. L. France were also asked for individually and for himself by each of the other defendants, so that each made the request that the court should charge that he individually was entitled to a verdict of not guilty, upon the same grounds set forth in the special charge asked for by the defendant A. L. France.

When proper and legal evidence has been given on the part of the government in a criminal trial, which if believed is sufficient in law to make out a crime and to sustain a conviction of the person on trial, a request to the court to direct the jury to acquit must be refused, and an exception to such refusal raises no question of law, even though the evidence on the part of the defendant is much stronger and more satisfactory than that for the government.    The question under such circumstances is one for the jury and not for the court.    In the view we take of this case, however, the request did not depend upon the credibility of witnesses or upon the weight to be given to the evidence in the case.    We assume the truth of all the evidence given on the part of the government with all proper inferences which may be drawn from it, but we do not think that such evidence brought plaintiffs in error within the provisions of the statute in regard to lotteries above set forth.    Therefore a motion to direct an acquittal raised a question of law, and an exception to the denial of the motion is properly reviewable here.

We are of opinion that in this case the messengers carrying across the border from Kentucky to Ohio the books and papers above referred to did not within the meaning of the statute carry any paper, certificate or instrument purporting

to be or represent a ticket, chance, share or interest in or dependent upon the event of a lottery, so called gift concert, or similar enterprise, offering prizes depending upon lot or chance, as provided for in such statute. The lottery had already been drawn; the papers carried by the messengers were not then dependent upon the event of any lottery. The language as used in the statute looks to the future. The papers must purport to be or represent an existing chance or interest which is dependent upon the event of a future drawing of the lottery. A paper that contains nothing but figures which in fact relate to a drawing that has already been completed, one that has passed and gone, cannot properly be said to be a paper, certificate or instrument as described in the statute. It purports to show no interest in or dependent upon the event of any lottery. If the lottery has been drawn, the interest is no longer dependent upon it. The condition upon which the bet or the interest was dependent has happened; the solution of the problem has already been arrived at; the bet has already been determined. The bare statement of that solution or determination placed on paper does not impart to that paper the character of a certificate or instrument purporting to be or represent a ticket, etc., dependent upon the event of a lottery. From the statement upon the paper, the agent may acquire the knowledge which will enable him to say who has won, but the book or the paper does not purport to be and is not a certificate, etc., within the act of Congress.

There is no contradiction in the testimony, and the government admits and assumes that the drawing in regard to which these papers contained any information had already taken place in Kentucky, and it was the result of that drawing only that was on its way in the hands of messengers to the agents of the lottery in Cincinnati.

The statute does not cover the transaction, and however reprehensible the acts of the plaintiffs in error may be thought to be, we cannot sustain a conviction on that ground. Although the objection is a narrow one, yet the statute being highly penal, rendering its violator liable to fine and imprisonment,

we are compelled to construe it strictly. Full effect is given to the statute by holding that the language applies only to that kind of a paper which depends upon a lottery the drawing of which has not yet taken place, and which paper purports to be a certificate, etc., as described in the act. If it be urged that the act of these plaintiffs in error is within the reason of the statute, the answer must be that it is so far outside of its language that to include it within the statute would be to legislate and not to construe legislation.

It has also been most strongly urged on the part of the plaintiffs in error that they were not, as shown by the evidence, engaged in the transaction of anything in the nature of interstate commerce, and that Congress had no constitutional right to pass an act which should be applicable to them under the circumstances disclosed by the proof in this case. It was argued that the subject was beyond the jurisdiction of Congress in the exercise of its powers concerning national or interstate commerce. The arguments upon this subject have on both sides been able and interesting, but as our decision in relation to the scope of the statute necessarily leads to a reversal of the judgment and a discharge of the plaintiffs in error, it is not necessary for us to decide the question as to the power of Congress, and we therefore express no opinion in regard to it.

*The judgment must be reversed, and the cause remanded to the District Court of the United States for the Southern District of Ohio, with directions to set aside the judgment and discharge the plaintiffs in error.*

MR. JUSTICE HARLAN dissented.